UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ELI E. ROSADO,                                      :

                Plaintiff,                    :          00 Civ. 4695 (AJP)

         -against-                        :          **OPINION AND ORDER**

MICHAEL J. ASTRUE, Commissioner of       :
Social Security,
                                                    :

            Defendant.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**ANDREW J. PECK, United States Magistrate Judge:**

        Pro se plaintiff Eli E. Rosado brings this action pursuant to § 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security ("the Commissioner") denying Rosado Disability Insurance benefits and Supplemental Security Income benefits.  (Dkt. No. 2: Compl.)  The Commissioner has moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No. 13: Am. Notice of Motion.)  The parties have consented to decision of this case by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 20.)

        For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is GRANTED.

H:\OPIN\ROSADO

# FACTS

## Procedural Background

On May 16, 1997, Rosado applied for Social Security Disability Insurance benefits and Supplemental Security Income benefits alleging that he was disabled since April 16, 1997.  (See Dkt. No. 10: Administrative Record filed by the Commissioner ["R."] 13, 86.)  In his application (R. 94-106), Rosado claimed to suffer from "lower back pain" and "high blood pressure."  (R. 95.)  An initial determination by the Social Security Administration ("SSA"), however, found that Rosado was not disabled.  (R. 52.)  On July 7, 1997, the SSA reconsidered Rosado's application, but again denied his claim.  (R. 53, 60-63.)  On April 29, 1998, Rosado requested an administrative hearing, asserting that he had a "new illness that prevent [him] from working."  (R. 64-66.)

Administrative Law Judge ("ALJ") Dennis G. Katz conducted hearings on November 13, 1998 and January 7, 1999. (R. 13, 33-51, 188-204.)  Rosado appeared at both hearings without an attorney.  (R. 40, 190-91.)  On January 29, 1999, ALJ Katz issued a written decision finding that Rosado was not disabled between April 16, 1997 and January 29, 1999.  (R. 10-31.)  ALJ Katz's decision became the Commissioner's final decision when the Appeals Council denied Rosado's request for review on December 14, 1999.  (R. 5-6.)

On June 26, 2000, Rosado filed this action against the Commissioner claiming that the ALJ's decision was "erroneous, not supported by substantial evidence on the record, and/or contrary to the law." (Dkt. No. 2: Compl. ¶ 9.)  On October 18, 2000, Judge Swain remanded the action to the Commissioner "for further administrative proceedings including locating or

reconstructing plaintiff's claims file."  (Dkt. No. 6: Stip. & Order.)  Certified administrative records were created on January 26, 2001 and March 15, 2001.  (See Dkt. No. 10: Commissioner Ans. ¶ 11; Dkt. No. 22: Commissioner Br. at 2.)  Due to an error by the Government, however, those records were not filed with the Court as required pursuant to sentence six of 42 U.S.C. § 405(g) until December 17, 2009, when the Government submitted the records along with its answer to Rosado's complaint.  (See Commissioner Ans. ¶ 11; Commisioner Br. at 2; see also 1/7/2010 Ltr. from AUSA James Peck to Judge Swain.)

The issue before the Court is whether the Commissioner's decision, that Rosado was not disabled from April 16, 1997 to January 29, 1999, is supported by substantial evidence.  The Court finds that it was.

**Non-Medical Evidence**

Rosado was born on September 5, 1954 and has an adult son.  (R. 86, 200-01.) Rosado received his GED in 1973 and attended hair-dressing school in 1980. (R. 104-05.) Between 1993 and 1997, Rosado worked as a customer service representative, interviewing customers, taking orders and entering data into computers. (R. 44-45, 126, 201-02.)  Rosado found this work stressful because of "[t]he nastiness of people that [he had to] deal with" caused "[e]motional pressure" and sometimes made him "snappy." (R. 39.)  Rosado last worked as a customer service representative for Cablevision in April 1997, when, after taking "off a whole bunch of days" because the pain in his back "got to the point where [he] couldn't even sit," his position was terminated. (R. 44, 126, 196, 201-02.)

Rosado testified that his ailments included "lower back pain," "high blood pressure," "degenerative [joint] disease" in his left ankle, "depression and anxiety." (R. 38, 193, 196-99, 202-03.) Rosado described his lower back pain as a "shooting pain" that occurred when he slept, leaned forward or tried to stand up. (R. 196-98.) He could sit comfortably for just thirty minutes at a time before having to lay down. (R. 202.) To manage his back pain, Rosado had "an injection in [his] spinal cord" and underwent "physical therapy and . . . pool therapy." (R. 196-97.) Although the treatments initially improved his condition, the pain returned when the injection wore off. (R. 197-98.) Rosado felt "excruciating pain inside" his left ankle because of his degenerative joint disease. (R. 198.) "[A]t nighttime or when it's real cold," Rosado's "whole foot hurt[]." (R. 199.) Rosado was prescribed a back brace and also an ankle brace and arch supports to stop the pain and keep his foot properly aligned. (R. 37-38.) Finally, Rosado's anxiety made him "feel like somebody [was] just sitting on [his] chest and [he] just want[ed] to . . . burst out and scream." (R. 203.) The only person Rosado felt he could talk to was his therapist, and he joined a church group to keep his "mind off it." (R. 200-01.) The anti-depressants he was prescribed caused "constant diarrhea," but when he tried to cut-down on his medications, it felt like "war in my brain." (R. 202.)

At the time of the hearings, Rosado rented a room from "a married couple and their three children." (R. 199.) Rosado got along with the couple but had difficulty with the children's "screaming . . . hollering and . . . running around." (R. 200.) Rosado took care of himself and did his own shopping and cooking. (R.199-200.) To keep himself busy, Rosado "read magazines," used the computer, and visited with his son and sister. (R. 200.)

Prior to the hearing, Rosado "ha[d] been looking for employment," but stopped after his "ankle started acting up and . . . [he] got tired of being told no."  (R. 50, 195-96.)  Rosado candidly admitted that he could work if he did not "have to deal with the public, [and] could just sit . . . in a computer situation just with data entry." (R. 50.)  Rosado also estimated that he could "stand four to six hours during the course of a day, and two hours without interruption."  (R. 37-38.)

**Vocational Expert Testimony**

Bala Carr, a board certified Vocational Expert who worked for the Social Security Administration since 1983, was called by ALJ Katz to testify as to the "availability of jobs and suitability of jobs" for someone of Rosado's "age, education and work experience," but with his physical and mental limitations.  (R. 39-40, 45.)  After reviewing Rosado's age, education, work experience and physical and stress-related limitations, Carr testified that there were a variety of light exertional level suitable jobs available in the national and regional economies, including "garment sorter," "marker," "duplicating machine operator," "library page" and "evening jobs" requiring data to be input into computers but without interaction with people.  (R. 45-49.)

**Medical Evidence**

Dr. Hui Lin began treating Rosado on March 6, 1997 for "hypertension" and "mild degenerative [disc] disease of [the lumbar] spine." (R. 135, 137, 142.)  On June 2, 1997, Dr. Lin completed a disability questionnaire for the New York State Department of Social Services.  (R. 141-47.)  He noted that Rosado had "questionable tenderness at [the] paraspinal area" (R. 143), but found no point tenderness or atrophy in Rosado's spine.  (R. 146-47.)  Review of a spinal x-ray taken on

February 27, 1997 revealed "minimal degenerative disc [disease] . . . mild retrolisthesis of L5 on S1 . . . [and] no spondylolysis." (R. 144.) A "Range of Motion Chart" prepared by Dr. Lin indicated that Rosado had full motion in the extremities, spine and ankles, while the range of motion in his hips was just short of full. (R. 146-47.) Rosado had "lower back pain on motion" and Dr. Lin referred him to physical therapy. (R. 142-43.) Dr. Lin stated that Rosado did not require an assistive device for walking. (R. 144.) Dr. Lin concluded that Rosado could occasionally "[l]ift and [c]arry" up to twenty pounds, "[s]tand and/or [w]alk" up to six hours per day and sit for up to six hours per day. (R. 145.) To control Rosado's high blood pressure, Dr. Lin prescribed Cardizen, Acupril and Ternomin. (R. 138-39, 143.)

On June 5, 1997, Dr. Wei Kao performed a consultative examination of Rosado. (R. 148-51.) Rosado told Dr. Kao that he had been having "back pains for 8 months," and explained that a "hot bath" relieved the pain but Tylenol #3 did not. (R. 148.) Rosado complained of "numbness and paraesthesia [sic] in [his] lower extremities, and significant weakness in [his] legs." (R. 148.) Upon examination, Dr. Kao determined that Rosado's "[g]ait and station [were] normal," and Rosado had no difficulty "getting on and off the examining table." (R. 149.) Dr. Kao reported that Rosado's "[l]umbar lordosis [was] normal with no scoliosis . . . or paraspinal muscles spasm." (R. 149.) Dr. Kao indicated that Rosado had tenderness over the lower spine, his range of motion was limited to 90° and that "[s]traight-leg-raising test is tender at 60° in left." (R. 149.) X-rays revealed "moderate intervertebral disc degeneration" of the lumbosacral spine. (R. 150, 152.) Dr. Kao determined that Rosado's hypertension was "[p]oorly controlled [and] needs additional medications," and that his

back pain was "likely due to muscle spasm[s]." (R. 151.) Dr. Kao concluded that Rosado should avoid frequent bending, but was otherwise "stable." (R. 151.) Dr. Kao did not make a psychiatric referral because Rosado did not complain of "previous []or current psychiatric history." (R. 151.)

On June 27, 1997, Dr. Knoble, a state agency medical examiner, reviewed Rosado's medical records and completed an assessment of his capacity to perform work-related activities. (R. 155-62.) Dr. Knoble determined that Rosado could "lift and/or carry" up to twenty pounds occasionally and ten pounds frequently, "[s]tand and/or walk" (with normak breaks) for about six hours in an eight-hour work day, sit (with normal breaks) for about six hours in an eight-hour work day and occasionally climb, balance, stoop, kneel, crouch and crawl. (R. 156-57.) As a result, Dr. Knoble concluded that Rosado was not disabled. (R. 52.) On October 10, 1997, Dr. Whiting, also a state agency medical examiner, reviewed Dr. Knoble's assessment and concurred with its findings. (R. 53, 162.)

On January 12, 1998, Dr. Marcia Lucas, Ps.D., wrote a letter to the Department of Social Services indicating that she had been treating Rosado "for approximately two months on a weekly basis." (R. 133, 167.) Dr. Lucas stated that Rosado "suffers from severe anxiety and depression symptoms" that could "interfere with his work relationships." (R. 133, 167.) On November 23, 1998, Dr. Lucas completed a disability questionnaire at the request of ALJ Katz. (R. 176-79, 180.) Dr. Lucas diagnosed Rosado with "Generalized Anxiety Disorder with MAJOR [] [d]epressive [f]eatures" and "BIPOLAR I Disorder." (R. 176.) Dr. Lucas felt that Rosado's activities of daily living were restricted, but believed he was an "independent man who can be effective when

his current anxiety/depression is managed . . . ."  (R. 177.)  Dr. Lucas determined that Rosado had a "problem with maintaining a consistent . . . pattern of normal social interaction"; although he is a "highly intelligent individual, his severe mood swings" and "explosive" anger "interfere with his ability to interact" with the public.  (R. 176-77.)  Dr. Lucas noted that Rosado performs better when in a one-on-one environment "in comfortable, familiar surroundings where he does not experience external pressure or control," and concluded that the prognosis was good for Rosado "to be reintegrated in the work force with contin[ued] mental health and physical rehabilitation."  (R. 178-79.)

On November 17, 1998, Dr. Luis Rodriguez-Betancourt completed a disability questionnaire at the request of ALJ Katz.  (R. 180, 181-83.) Dr. Rodriguez-Betancourt began treating Rosado in June 1997 for anxiety disorder, hypertension, degenerative disc disease and "[c]hronic [left] [a]nkle [p]ain."  (R. 181.)  Dr. Rodriguez-Betancourt reported that Rosado could lift fifteen to twenty pounds, but that repetitive lifting would "aggravate [his] back pain."  (R. 182.)  Rosado could stand and/or walk for four to six hours in an eight-hour day and sit for six to eight hours in an eight-hour day, but standing for more than two hours at a time, or sitting for longer than three hours at a time, would "probably aggravate [Rosado]'s back pain."  (R. 182.)  Dr. Rodriguez-Betancourt concluded that despite Rosado's mental and physical impairments, he could "perform a clerical type job" provided he had the "physical freedom to sit [and] stand and change position [without] heavy lifting."  (R. 183.)

On November 28, 1998, Dr. Rodriguez-Betancourt ordered an MRI of Rosado's left foot and ankle. (R. 128-29.) The MRI revealed "synostosis[] with associated talar breaking," but no abnormalities in the muscle, tendons or ligaments. (R. 129.) On December 18, 1998, Dr. Rodriguez-Betancourt prescribed a "V-Lock" back brace and arch supports to relieve pain in Rosado's back and ankles. (R. 130-32.)

**The ALJ's Decision**

In a decision dated January 29, 1999, ALJ Katz denied Rosado's application for Disability Insurance benefits and Supplemental Security Income benefits for the period from April 16, 1997 to January 29, 1999. (R. 10-31.)

ALJ Katz reviewed Rosado's claim of disability resulting from back pain, left ankle impairment, hypertension and mental illness, considering both his testimony and medical records. (R. 14-24.) The medical records reviewed included an X-Ray taken on June 5, 1997, an MRI taken on November 28, 1998, and reports from Rosado's treating physicians, consultative physician and the state agency medical examiners. (R. 15-23.) ALJ Katz noted Rosado's testimony that "he experiences back and ankle pain," but stated that Rosado's testimony was "not given conclusive weight" because it was not consistent with his "demeanor while testifying" or "in proportion to the impairments established by the medical findings in the record." (R. 19, 21-22.) ALJ Katz afforded "great weight" to treating physician Dr. Rodriguez-Betancourt's opinion that Rosado was "capable of standing/walking 4-6 hours per day, remaining in a seated position for 6-8 hours per day and lifting objects weighing between 15-20 pounds," and to Dr. Lucas' opinion that Rosado had

"difficulties interacting with strangers." (R. 20-21.) Although the reports of the state medical examiners were "entitled to less weight than that given to the report of an examining physician" because the medical examiner's reports were not "based on an actual, physical examination," ALJ Katz noted that the state medical examiners' opinions were "roughly equivalent" to the opinions expressed by Rosado's treating physicians. (R. 21.)

ALJ Katz applied the appropriate five step legal analysis as follows: At the first step, ALJ Katz found that Rosado had not "engaged in any work activity from April 16, 1997 through the present time." (R. 15.) At the second step, ALJ Katz found that Rosado's "back impairments, left ankle impairment and hypertension - in combination - are 'severe' within the meaning of the Act." (R. 16.) He also found that Rosado's "emotional impairment is 'severe' in that it results in some limitation in [Rosado's] mental ability to do basic work activities." (R. 18.) At the third step, ALJ Katz found that Rosado's impairments did not "meet or equal in severity the clinic[al] criteria. . . . set forth in" the Social Security regulations. (R. 19.) At the fourth step, ALJ Katz determined that Rosado was:

> . . . able to sit for a total of up to and including 7 hours and stand/walk a total of up to and including 6 hours during the course of an 8-hour work day. He has the ability frequently and occasionally to lift and carry objects weighing up to and including 20 pounds. Additionally, due to his mental impairment, he is limited to performing tasks which require minimal stress and minimal interactions with the public. Because of his tendency towards high blood pressure, the claimant cannot perform aerobic activities.

(R. 22.) Because his "past relevant work" required "a great deal of interaction with members of the public," Rosado could no longer perform it. (R. 22-23.) At the fifth and final step, ALJ Katz

concluded that "there are jobs existing in significant numbers in the national and regional economies that [Rosado] is capable of preforming." (R. 23-24.) As a result, ALJ Katz found that Rosado "is not disabled and is not entitled to receive disability benefits." (R. 24.)

ALJ Katz's decision became the final decision of the Commissioner when the Appeals Council denied review on December 14, 1999. (R. 5-6.)

**Medical Evidence Not Before the ALJ**

On January 30, 2001, Rosado mailed to the United States Attorney's Office various medical records relating to his injuries. (Dkt. No. 22: Commissioner Br. Exs. 1-3.)[1/] In addition to documents already included in the record (Ex. 1), Rosado submitted records from Dr. Hui Lin covering the period from February 25, 1997 to June 17, 1997 and a September 24, 1998 letter from Dr. Marcia Lucas. (Ex. 2.) According to Dr. Lin's records, on April 1, 1997, Rosado complained of "severe back pain radiating down his legs." (Ex. 2 at 13.) X-Rays of Rosado's lumbosacral spine taken on February 27, 1997 revealed "1. Minimal Degenerative Disc Disease at L5-S1[,] 2. Mild Retrolisthesis of L5 on S1 [and] 3. No Spondylolysis." (Ex. 2 at 8.) On May 20, 1997, Dr. Lin gave Rosado a letter for "welfare" stating that he was unfit for work. (Ex. 2 at 16.) Dr. Lucas' letter, addressed to the Family Court of the State of New York, mentioned Rosado's "notable improvement" in his mental health symptoms but reasoned that his "mental health impairments" prevented him from being as "functional" as he once had been. (Ex. 2 at 1.) Dr. Lucas remarked that Rosado was

---

[1/]    All references to exhibits, unless otherwise indicated, are to the Commissioner's Brief. (Dkt. No. 22.)

"actively seek[ing] employment," but had yet to find a job.  (Ex. 2 at 1.)  Other records submitted

by Rosado, including those from Drs. Rodriguez-Betancourt, Menegus and Valdes, do not relate to

the period in question, i.e., April 16, 1997 to January 29, 1999, and, accordingly, are not germane

to the present action.  (Ex. 3.)  These records indicate, however, that Rosado suffered heart attacks

sometime in April and May 2000.  (Ex. 3; see page 28 n.16 below.)

## ANALYSIS

I.    **THE APPLICABLE LAW**

      A.    **Definition of Disability**

          A person is considered disabled for Social Security benefits purposes when she is

unable "to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart

v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Salmini v. Comm'r of Soc. Sec., No.

09-3642-cv, 2010 WL 1170133 at *1 (2d Cir. Mar. 25, 2010); Betances v. Comm'r of Soc. Sec., 206

Fed. Appx. 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 Fed. Appx. 37, 39 (2d Cir.

2006); Rodriguez v. Barnhart, 163 Fed. Appx. 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 Fed.

Appx. 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005).[2]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A)(B), 1382c(a)(3)(B)(G); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Salmini v. Comm'r of Soc. Sec., 2010 WL 1170133 at *1; Betances v. Comm'r of Soc. Sec., 206 Fed. Appx. at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472.[3]

> In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider:  "(1) the objective medical facts;  (2) diagnoses or medical opinions based on such facts;  (3) subjective evidence of pain or disability testified to by the claimant or

---

[2]    See also, e.g., Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

[3]    See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

others; and (4) the claimant's educational background, age, and work experience." Mongeur v.

Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[4/]

**B.      Standard of Review**

A court's review of the Commissioner's final decision is limited to determining

whether there is "substantial evidence" in the record to support such determination. E.g., Salmini

v. Comm'r of Soc. Sec., 2010 WL 1170133 at *1; Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.),

cert. denied, 127 S. Ct. 2981 (2007); Halloran v. Barnhart 362 F.3d 28, 31 (2d Cir. 2004), Jasinski

v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d

Cir. 2003); 42 U.S.C. § 405(g).[5/] "'Thus, the role of the district court is quite limited and substantial

---

[4/]      See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62; Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).

[5/]      See also, e.g., Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Vapne v. Apfel, 36 Fed. Appx. 670, 672 (2d Cir.), cert. denied, 537 U.S. 961, 123 S. Ct. 394 (2002); Horowitz v. Barnhart, 29 Fed. Appx. 749, 752 (2d Cir. 2002); Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983); Rodriguez v. Barnhart, 03 Civ. 7272, 2004 WL 1970141 at *8 (S.D.N.Y. Aug. 23, 2004), aff'd, 163 Fed. Appx. 15 (2d Cir. 2005).

deference is to be afforded the Commissioner's decision.'" Morris v. Barnhardt, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002).[6]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Comins v. Astrue, No. 09-2221-cv, 2010 WL 1490067 at *1 (2d Cir. Apr. 15, 2010); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[7] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983).  The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[8]  However, the Court will not defer to

---

[6]    See also, e.g., Duran v. Barnhart, 01 Civ. 8307, 2003 WL 103003 at *9 (S.D.N.Y. Jan. 7, 2003); Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review.") (quotations & alterations omitted).

[7]    See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Green-Younger v. Barnhart, 335 F.3d at 106; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Curry v. Apfel, 209 F.3d at 122; Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[8]    See also, e.g., Colling v. Barnhart, 254 Fed. Appx. 87, 88 (2d Cir. 2007); Veino v. Barnhart, 312 F.3d at 586; Toles v. Chater, No. 96-6065, 104 F.3d 351 (table), 1996 WL 545591 at *1
(continued...)

the Commissioner's determination if it is "'the product of legal error.'"  E.g., Duvergel v. Apfel, 99

Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Butts v.

Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005);

Tejada v. Apfel, 167 F.3d at 773 (citing cases).

        The Commissioner's regulations set forth a five-step sequence to be used in evaluating

disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-

25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291

(1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, 42 U.S.C. §§ 405(a) (Title II),
> 1383(d)(1) (Title XVI), the agency has promulgated regulations establishing a five-
> step sequential evaluation process to determine disability.  See 20 CFR § 404.1520
> (2003) (governing claims for disability insurance benefits); § 416.920 (parallel
> regulation governing claims for Supplemental Security Income).  If at any step a
> finding of disability or non-disability can be made, the SSA will not review the claim
> further.  [1] At the first step, the agency will find non-disability unless the claimant
> shows that he is not working at a "substantial gainful activity."  §§ 404.1520(b),
> 416.920(b).  [2] At step two, the SSA will find non-disability unless the claimant
> shows that he has a "severe impairment," defined as "any impairment or combination
> of impairments which significantly limits [the claimant's] physical or mental ability
> to do basic work activities."  §§ 404.1520(c), 416.920(c).  [3] At step three, the
> agency determines whether the impairment which enabled the claimant to survive
> step two is on the list of impairments presumed severe enough to render one disabled;
> if so, the claimant qualifies.  §§ 404.1520(d), 416.920(d).  [4] If the claimant's
> impairment is not on the list, the inquiry proceeds to step four, at which the SSA
> assesses whether the claimant can do his previous work; unless he shows that he
> cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth
> stage, the fifth, and final, step requires the SSA to consider so-called "vocational
> factors" (the claimant's age, education, and past work experience), and to determine

---

[8]     (...continued)
    (2d Cir. Sept. 26, 1996).

whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.   §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. omitted);[9] accord, e.g., Salmini v. Comm'r of Soc. Sec., 2010 WL 1170133 at *1; Williams v. Comm'r of Soc. Sec., 236 Fed. Appx. 641, 643 (2d Cir. 2007); Betances v. Comm'r of Soc. Sec., 206 Fed. Appx. at 26; Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774.[10]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that she cannot return to her past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant

---

[9] Amendments to 20 C.F.R. 404.1520 became effective September 25, 2003. See 68 Fed. Reg. 51153, 2003 WL 22001943 (Aug. 26, 2003); see also Barnhart v. Thomas, 540 U.S. at 25 n.2, 124 S. Ct. at 380 n.2.  The amendments, inter alia, added a new § 404.1520(e) and redesignated previous §§ 404.1520(e) and (f) as §§ 404.1520(f) and (g), respectively.  20 C.F.R. § 404.1520; see 68 Fed. Reg. 51156.  The new § 404.1520(e) explains that if the claimant has an impairment that does not meet or equal a listed impairment, the SSA will assess the claimant's residual functional capacity.  20 C.F.R. § 404.1520(e).  The SSA uses the residual functional capacity assessment at step four to determine whether the claimant can perform past relevant work and, if necessary, at step five to determine whether the claimant can do any work.  See 68 Fed. Reg. 51156. The ALJ appropriately utilized the residual functional capacity assessment amendments in this case.  (See pages 10-11 above.)

[10] See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Green-Younger v. Barnhart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d at 132; Curry v. Apfel, 209 F.3d at 122; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d at 79-80; Schaal v. Apfel, 134 F.3d at 501; Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

can perform considering not only her medical capacity but also her age, education and training.  See,

e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[11/]

### C.    The Treating Physician Rule

The "treating physician's rule" is a series of regulations set forth by the Commissioner

in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion.

Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2); see, e.g., Meadors v. Astrue, No. 09-3545-cv, 2010 WL 1048824 at *2

(2d Cir. Mar. 23, 2010); Colling v. Barnhart, 254 Fed. Appx. 87, 89 (2d Cir. 2007); Lamorey v.

Barnhart, 158 Fed. Appx. 361, 362 (2d Cir. 2006).[12/]

---

[11/]    See also, e.g., Salmini v. Comm'r of Soc. Sec., 2010 WL 1170133 at *2; Williams v. Comm'r of Soc. Sec., 236 Fed. Appx. at 643; Betances v. Comm'r of Soc. Sec., 206 Fed. Appx. at 26; Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004); Green-Younger v. Barnhart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d at 472; Curry v. Apfel, 209 F.3d at 122; Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

[12/]    See also, e.g., Foxman v. Barnhart, 157 Fed. Appx. 344, 346 (2d Cir. 2005); Tavarez v. Barnhart, 124 Fed. Appx. 48, 49 (2d Cir. 2005); Donnelly v. Barnhart, 105 Fed. Appx. 306, 308 (2d Cir. 2004); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Kamerling v. Massanari, 295 F.3d 206, 209 n.5 (2d Cir. 2002); Jordan v. Barnhart, 29 Fed. Appx. 790, 792 (2d Cir. 2002); Bond v. Soc. Sec. Admin., 20 Fed. Appx. 20, 21 (2d Cir. 2001); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well supported" by other medical evidence), the Court should consider the following factors in determining the weight to be given such an opinion:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant.  20 C.F.R. § 404.1527(d)(2); see, e.g., Gunter v. Comm'r of Soc. Sec., No. 08-5544-cv, 2010 WL 145273 at *1 (2d Cir. Jan. 15, 2010); Foxman v. Barnhart, 157 Fed. Appx. at 346-47; Halloran v. Barnhart, 362 F.3d at 32; Shaw v. Chater, 221 F.3d at 134; Clark v. Comm'r, 143 F.3d at 118; Schaal v. Apfel, 134 F.3d at 503.[13/]

The Commissioner's "treating physician" regulations were approved by the Second Circuit in Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

## II.   APPLICATION OF THE FIVE STEP SEQUENCE TO ROSADO'S CLAIMS

The Court must determine if the Commissioner's decision that Rosado was not disabled during the relevant period from April 17, 1997 (the alleged onset date) through January 29, 1999 (the date ALJ Katz denied his claim), was supported by substantial evidence.  The

---

[13/]      See also, e.g., Kugielska v. Astrue, 06 Civ. 10169, 2007 WL 3052204 at *8 (S.D.N.Y. Oct. 16, 2007); Hill v. Barnhart, 410 F. Supp. 2d 195, 217 (S.D.N.Y. 2006); Klett v. Barnhart, 303 F. Supp. 2d 477, 484 (S.D.N.Y 2004); Rebull v. Massanari, 240 F. Supp. 2d 265, 268 (S.D.N.Y. 2002).

Commissioner's decision that Rosado was not disabled is affirmed since it is supported by substantial evidence.

**A.     Rosado Was Not Engaged in Substantial Gainful Activity**

The first inquiry is whether Rosado was engaged in substantial gainful activity after his applications for Disability Insurance Benefits and Supplemental Security Income . "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit."  20 C.F.R. § 404.1510.  ALJ Katz's conclusion that Rosado was not engaged in substantial activity during the applicable time period (R. 15; see page 10 above) benefits Rosado and is not disputed.

**B.     Rosado Demonstrated "Severe" Physical and Mental Impairments That Significantly Limited His Ability To Do Basic Work Activities**

The next step of the analysis is to determine whether Rosado proved that he had a severe impairment or combination of impairments that "significantly limit[ed his] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b). "Basic work activities" include:

> . . . walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . .[u]nderstanding, carrying out, and remembering simple instructions . . .[u]se of judgment . . .[r]esponding appropriately to supervision, co-workers and usual work situations.

20 C.F.R. § 404.1521(b)(1)-(5).  The Second Circuit has warned that the step two analysis may not do more than "screen out de minimis claims."  Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995).

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process." Rosario v. Apfel, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19, 1999) (citing 20 C.F.R. § 404.1520(C)).  On the other hand, if the disability claim rises above the de minimis level, then the further analysis of step three and beyond must be undertaken. See, e.g., Dixon v. Shalala, 54 F.3d at 1030.

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" Rosario v. Apfel, 1999 WL 294727 at *5 (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

ALJ Katz determined that the medical evidence indicated that Rosado's "back impairments, left ankle impairment, and hypertension - in combination - are 'severe' within the meaning of the Act," and that Rosado's "emotional impairment is 'severe' in that it results in some limitation in [his] mental ability to do basic work activities." (R. 16-18; see page 10 above.)  These findings benefit Rosado and are not disputed.  The Court therefore proceeds to the third step of the five part analysis.

C.     **Rosado Did Not Have A Disability Listed in Appendix 1 of the Regulations**

The third step of the five-part test requires a determination of whether Rosado had an impairment listed in Appendix 1 of the Regulations. 20 C.F.R., Pt. 404, Subpt. P, App. 1. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful

employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

ALJ Katz found that while Rosado's medically-determinable impairments were "severe" based on the requirements in Regulations 20 CFR § 404.1520(c), he did "not have clinical or laboratory findings of an impairment which meet or equal in severity the clinical criteria of any impairment set forth" in Appendix 1 to Subpart P of Part 404 of the Regulations.  (R. 19-22; see page 10 above.)  Appendix 1 provides a categorization of physical and mental impairments, including musculoskeletal system, cardiovascular system and mental disorders.  See 20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 1.00, 4.00 & 12.00.

1.    **Rosado's Ankle and Back Pain Do Not Satisfy Appendix 1**

Sections 1.02 and 1.04 outline the conditions required to establish disorders of the joint and spine.  20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 1.02, 1.04.  To qualify, Rosado's ankle pain must constitute a "[m]ajor dysfunction of a joint(s)," characterized by:

> gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02.  "Inability [t]o ambulate effectively" means:

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very
> seriously with the individual's ability to independently initiate, sustain, or complete
> activities.  Ineffective ambulation is defined generally as having insufficient lower
> extremity functioning (see 1.00J) to permit independent ambulation without the use
> of a hand-held assistive device(s) that limits the functioning of both upper
> extremities.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1).  "To ambulate effectively,"

> individuals must be capable of sustaining a reasonable walking pace over a sufficient
> distance to be able to carry out activities of daily living. They must have the ability
> to travel without companion assistance to and from a place of employment or school.
> Therefore, examples of ineffective ambulation include, but are not limited to, the
> inability to walk without the use of a walker, two crutches or two canes, the inability
> to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use
> standard public transportation, the inability to carry out routine ambulatory activities,
> such as shopping and banking, and the inability to climb a few steps at a reasonable
> pace with the use of a single hand rail.  The ability to walk independently about one's
> home without the use of assistive devices does not, in and of itself, constitute
> effective ambulation.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(2).

ALJ Katz found that Rosado's left ankle pain constituted a severe impairment but did

not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1.  (See page 10 above.)  The medical evidence supports that finding.

On May 15, 1997 Dr. Hui Lin stated that Rosado had full range of motion in his

ankles and that he did not require an assistive device to walk.  (See pages 5-6 above.)  Similarly, on

June 5, 1997, Dr. Wei Kao reported that Rosado's "gait and station [were] normal" and that he had

full range of motion in his joints.  (See pages 6-7 above.)  Although an MRI taken on November 28,

1998, revealed "synostosis[] with associated talar breaking" (see page 9 above), Rosado testified that

he was able to do his own shopping and make social visits to his son's home.  (See page 4 above.)

On December 18, 1998, Dr. Rodriguez-Betancourt prescribed arch supports to relieve the pain in Rosado's ankle, but also concluded that Rosado was able to ambulate effectively.  (See pages 8-9 above.)  Finally, Rosado testified that he was capable of walking for up to six hours over the course of a day, and for two hours at a time.  (See page 5 above.)

Nothing in the record shows that Rosado's left ankle pain was so severe during the period from April 1997 to January 1999 as to cause an

> inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(2).  Accordingly, Rosado's left ankle pain does not qualify as a major dysfunction of the joint.

Rosado's back pain would have to constitute a "Disorder[] of the spine" to qualify as an Appendix 1 impairment.  Specifically, an individual must have a disorder

> (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe

burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.04.

ALJ Katz found that Rosado's back pain constituted a severe impairment, but did not meet or medically equal a Listed impairment.  (See page 10 above.)  The medical evidence supports that finding.

On March 6, 1997, Dr. Lin began treating Rosado for "degenerative [disc] disease of [the lumbar] spine."  (See pages 5-6 above.)  Although "degenerative disc disease" qualifies as a disorder of the spine when accompanied by the conditions listed in §1.04(A), (B) or (C), no corresponding conditions existed here.  As to subsection A, Dr. Lin reported "questionable tenderness at [the] paraspinal area," but found no point tenderness or atrophy in Rosado's spine.  (See page 5 above.)  Although Rosado had "lower back pain on motion," Dr. Lin indicated that Rosado had full range of motion of his extremities and spine flex (see page 6 above), and "positive straight leg raising test on both sides" (R. 143).  Similarly, despite Rosado's complaint of "numbness and paraesthesia [sic] in [his] lower extremities, and significant weakness in [his] legs," Dr. Kao found Rosado to have normal "[g]ait and station" and observed that Rosado had no difficulty "getting on and off the examining table."  (See page 6 above.)  Although Dr. Kao reported tenderness over the

lower spine, that Rosado's motion was limited to 90°, and that "[s]traight-leg-raising test is tender at 60°," he concluded that Rosado's back pain was most "likely due to muscle spasm[s]." (See pages 6-7 above.)  In the absence of evidence indicating nerve root compression, the presence of some limitation of motion or radiating pain is insufficient to the meet the Appendix 1 Listing.  See, e.g., Otts v. Comm'r of Soc. Sec., 249 Fed. Appx. 887, 889 (2d Cir. 2007) (plaintiff not disabled with a spinal disorder under §1.04(A) where plaintiff's treating physician found some decreased muscle strength, motion and sensation in plaintiff's arm, but did not find nerve root compression); McKinney v. Astrue, No. 05-CV-0174, 2008 WL 312758 at *5 (N.D.N.Y. Feb. 1, 2008) (plaintiff not disabled under § 1.04(A) where plaintiff did not satisfy "the combination of all symptoms as well as evidence of a compromised nerve root or spinal cord").

    As to subsection B,  there is no evidence in the record of Rosado being diagnosed with spinal arachnoiditis, manifested by severe burning or painful dysesthesia.  Moreover, Dr. Rodriguez-Betancourt found that, during an eight hour day, Rosado could stand for two hours at a time and sit continuously for up to three hours without moving.  (See page 8 above.)[14] Thus, even were there a diagnosis of spinal arachnoiditis, the need for changes in position or posture less than once every two hours is insufficient to satisfy § 1.04(B).

    As to subsection C, there is no evidence in the record of Rosado being diagnosed with lumbar spine stenosis.  In addition, there is no evidence that Rosado had "chronic nonradicular pain

---

[14]  Similarly, the state medical examiner's report noted that Rosado could sit, stand or walk about six hours in an eight hour day.  (See page 7 above.)

and weakness . . . resulting in inability to ambulate effectively, as defined in 1.00B2b."  20 C.F.R.,

Pt. 404, Subpt. P, App. 1, § 1.04(C).  Accordingly, there is insufficient evidence to satisfy § 1.04(C).

Substantial evidence supports ALJ Katz's determination that Rosado's ankle and back

pain did not equal one of the impairments listed in Appendix 1.

### 2.      Rosado's Hypertension Does Not Satisfy Appendix 1

The evaluation of hypertension is explained in a section titled "Evaluating Other

Cardiovascular Impairments" in the Listing of Impairments:

> Because hypertension (high blood pressure) generally causes disability through its
> effects on other body systems, we will evaluate it by reference to the specific body
> system(s) affected (heart, brain, kidneys, or eyes) when we consider its effects under
> the listings. We will also consider any limitations imposed by your hypertension
> when we assess your residual functional capacity.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.00(H)(1).

ALJ Katz found that Rosado's hypertension "in combination" with his other

impairments, constituted a severe impairment but did not find that it met the requirements of

Appendix 1.[15/]  (R. 16; see page 10 above.)

During the period in question, Rosado's blood pressure readings fluctuated and were

sometimes high  (R. 143, 151; Dkt. No. 22: Ex. 2 at 11-16), but he was prescribed medication to

control it (see page 6 above).  There is no evidence that Rosado's hypertension effected or impaired

---

[15/]      The ALJ did not elaborate on why Rosado's hypertension did not fall within the listings.  (R.
16-19.)

other bodily systems during the period in question.[16]   The ALJ, therefore, correctly concluded that

Rosado's  hypertension was not disabling.  See, e.g., Garner v. Astrue, 08 Civ. 6367, 2009 WL

903742 at *17 (S.D.N.Y. Apr. 6, 2009) (Peck, M.J.) (hypertension did not satisfy Appendix 1 where

there was no evidence that it "produce[d] any effects (primary or secondary) that severely impaired

other bodily systems."), report & rec. adopted in part, 2009 WL 1911744 (S.D.N.Y. Jun. 30, 2009);

Anderson v. Astrue, 07 Civ. 7195, 2008 WL 655605 at *14 (S.D.N.Y. Mar. 12, 2008) (Peck, M.J.)

(same), report & rec. adopted, 2008 WL 2463885 (S.D.N.Y. Jun. 18, 2008); Nunez v. Barnhart, 05

Civ. 9221,  2007 WL 313459 at *6-7 (S.D.N.Y. Feb. 1, 2007) (hypertension was asymptomatic,

controlled by medication, and did not affect plaintiff's ability to perform basic work activities); Snipe

v. Barnhart, 05 Civ. 10472, 2006 WL 2390277 at *15 (S.D.N.Y. Aug. 21, 2006) (Peck, M.J.)

(plaintiff's hypertension not disabling where it was under control due to medication), report & rec.

adopted, 2006 WL 2621093 (S.D.N.Y. Sept. 12, 2006); Lowe v. Barnhart, 04 Civ. 9012, 2006 WL

1911020 at *7-8 (S.D.N.Y. July 10, 2006) (plaintiff's hypertension not a severe impairment where

controlled through medication and plaintiff could perform a variety of daily activities); Tillackdharry

v. Barnhart, 05 Civ. 6639, 2006 WL 903191 at *5 (S.D.N.Y. Apr. 10, 2006) (plaintiff's hypertension

not disabling where controlled by medication and he had the residual functional capacity to perform

a significant range of light work).

---

[16]   Rosado submitted medical records showing that he had two heart attacks, one on April 24,
2000 and one on May 1, 2000.  (Ex. 3.)  As a result, Rosado suffered decreased aerobic
capacity.  (Ex. 3 at 1.)  These records, however, do not relate to the period in question, i.e.,
April 16, 1997 to January 29, 1999.  Rosado may (or may not) be disabled in 2000 and
thereafter as a result of those heart attacks, but that period is not before the Court in this case.

Substantial evidence supports ALJ Katz's determination that Rosado's hypertension did not meet the requirements of the listed impairments in Appendix 1.

### 3.    Rosado's Mental Impairments Do Not Satisfy Appendix 1

In order to qualify for a disability, Rosado's mental impairment must qualify as an affective disorder or an anxiety related disorder.  20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06.

Section 12.04 defines affective disorder, as an impairment:

Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome . . . .

2. Manic syndrome . . . .

3. Bipolar syndrome . . . .

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.04.

Similarly, section 12.06 describes conditions required to demonstrate anxiety related

disorders:

In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A. Medically documented findings of at least one of the following:

1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

a. Motor tension; or

b. Autonomic hyperactivity; or

c. Apprehensive expectation; or

d. Vigilance and scanning;

or

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.

With regard to the "'B' Criteri[a]" for each the above disorders, ALJ Katz found Rosado to have: (1) no restrictions of "'activities of daily living'"; (2) "moderately impaired" "'social functioning'" (3) a "'seldom' or 'slight'" loss of "'concentration, persistence and pace'"; and (4) occasional "'deterioration or decompensation in work or work-like settings.'" (R. 16-18.) Because there was "no evidence that [Rosado] [wa]s incapable of functioning independently outside the area of his home," ALJ Katz determined that the "'C' criteria" had not been met. (R. 18.)

The medical and record evidence supports ALJ Katz's determination that Rosado's mental impairments did not rise to the level of severity necessary to qualify as a § 12.04 or § 12.06 disability. Rosado testified that he is capable of doing his own cooking and shopping. (See page 4 above.) Moreover, according to Dr. Lucas, Rosado's treating psychiatrist, Rosado was "always extremely well groomed, neat and appropriately dressed." (R. 177.) Dr. Lucas further observed that Rosado is "punctual and has excellent attendance." (R. 178.) Although Rosado's had a "problem with maintaining a consistent . . . pattern of normal social interaction," Dr. Lucas believed him to be an "independent man who can be effective when his . . . anxiety/depression is managed." (See pages 7-8 above.) Even though Rosado's "severe mood swings" and "explosive" anger could "interfere with his work relationships," Dr. Lucas felt the prognosis was good for Rosado "to be reintegrated in the work force with contin[ued] mental health and physical rehabilitation." (See page 8 above.) Finally, although Rosado has a tendency to "decompensate if [he] has [a] severe anxiety attack," he "never threatened to physically harm anyone" and "usually calms down after ventilating his frustration." (R. 178.)

As to subsection 12.04(C), the record contains no evidence of a medically documented history of a chronic affective disorder of at least two years of duration.  With respect to 12.06(C), Rosado's own testimony and actions demonstrate his ability to function independently outside the area of his home.

Substantial evidence supports ALJ Katz's determination that Rosado's mental impairments did not meet the Listing requirements.

**D.**     **Rosado Did Not Have the Ability to Perform His Past Work**

The fourth prong of the five part analysis is whether Rosado had the residual functional capacity to perform his past relevant work.  Having considered Dr. Lucas' opinion that Rosado had "difficulties interacting with strangers (i.e. the public)," ALJ Katz determined that Rosado was not able to resume his past work as a customer service representative.  (R. 21-23.) Since this finding favors Rosado, the Court proceeds to the fifth step of the analysis.

**E**.     **Rosado Can Perform Other Work In The Economy**

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training."  Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980); see, e.g., Arruda v. Comm'r of Soc. Sec., No. 08-3128-CV, 2010 WL 324002 at *2 (2d Cir. Jan. 29, 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir. 2004), amended on other grounds, 416

F.3d 101 (2d Cir. 2005); Curry v. Apfel, 209 F.3d 117, 122-23 (2d Cir. 2000); Rosa v. Callahan, 168

F.3d 72, 77 (2d Cir. 1999).[17/]

        In meeting his burden under the fifth step, the Commissioner ordinarily will make use

of the "Grid":

> In meeting [his] burden of proof on the fifth step of the sequential evaluation process
> described above, the Commissioner, under appropriate circumstances, may rely on
> the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App.
> 2, commonly referred to as "the Grid."  The Grid takes into account the claimant's
> residual functional capacity in conjunction with the claimant's age, education and
> work experience.  Based on these factors, the Grid indicates whether the claimant can
> engage in any other substantial gainful work which exists in the national economy.
> Generally the result listed in the Grid is dispositive on the issue of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fns. omitted); see, e.g., Heckler v.

Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the

promulgation of the Grid); Martin v. Astrue, 337 Fed. Appx. 87, 90 (2d Cir. 2009); Rosa v. Callahan,

168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d 601, 604

(2d Cir. 1986).[18/]  "The Grid classifies work into five categories based on the exertional requirements

---

17/     See also, e.g., De Roman v. Barnhart, 03 Civ. 0075, 2003 WL 21511160 at *16-17
(S.D.N.Y. July 2, 2003) (Peck, M.J.); Alvarez v. Barnhardt, 02 Civ. 3121, 2002 WL
31663570 at *11 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.), report & rec. adopted, 2003 WL
272063 (S.D.N.Y. Jan. 16, 2003); Morel v. Massanari, 01 Civ. 0186, 2001 WL 776950 at
*11 (S.D.N.Y. July 11, 2001) (Peck, M.J.); Vega v. Comm'r, 97 Civ. 6438, 1998 WL 255411
at *10 (S.D.N.Y. May 20, 1998) (Peck, M.J.); Pickering v. Chater, 951 F. Supp. 418, 425
(S.D.N.Y. 1996) (Batts, D.J. & Peck, M.J.);  DeJesus v. Shalala, 94 Civ. 0772, 1995 WL
812857 at *6-7 (S.D.N.Y. June 14, 1995) (Peck, M.J.), report & rec. adopted, 899  F. Supp.
1171 (S.D.N.Y. 1995).

18/     See also, e.g., De Roman v. Barnhart, 2003 WL 21511160 at *16-17; Alvarez v. Barnhardt,
                            (continued...)

of the different jobs.  Specifically, it divides work into sedentary, light, medium, heavy and very heavy, based on the extent of requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling."  Zorilla v. Chater, 915 F. Supp. at 667 n.2; see 20 C.F.R. § 404.1567(a).[19/]   Taking account of the claimant's residual functional capacity, age, education, and prior work experience, the Grid yields a decision of "disabled" or "not disabled."  20 C.F.R. § 404.1569, § 404 Subpt. P, App. 2, 200.00(a).

Based upon the reports of:  (1) treating physicians Dr. Lin, Dr. Rodriguez-Betancourt and Dr. Lucas; (2) consultative physician Dr. Kao; and (3) the state agency medical examiners Dr. Knoble and Dr. Whiting, ALJ Katz determined that Rosado was:

> . . . able to sit for a total of up to and including 7 hours and stand/walk a total of up to and including 6 hours during the course of an 8-hour work day.  He has the ability frequently and occasionally to lift and carry objects weighing up to and including 20 pounds.  Additionally, due to his mental impairment, he is limited to performing tasks which require minimal stress and minimal interactions with the public. Because of his tendency towards high blood pressure, the claimant cannot perform aerobic activities.

(See page 10 above.)

---

[18/]     (...continued)
2002 WL 31663570 at *11; Morel v. Massanari, 2001 WL 776950 at *12; Vega v. Comm'r, 1998 WL 255411 at *10; Pickering v. Chater, 951 F. Supp. at 425.

[19/]     See also, e.g., De Roman v. Barnhart, 2003 WL 21511160 at *17; Perez v. Chater, 77 F.3d at 46;  Alvarez v. Barnhardt, 2002 WL 31663570 at *11; Morel v. Massanari, 2001 WL 776950 at *12; Vega v. Comm'r, 1998 WL 255411 at *10; Pickering v. Chater, 951 F. Supp. at 425.

The medical evidence from Rosado's treating physicians support ALJ Katz's finding. Dr. Lin reported that Rosado could occasionally lift and carry up to twenty pounds, stand or walk for up to six hours per day, and sit for up to six hours per day.  (See page 6 above.)  Dr. Rodriguez-Betancourt similarly concluded that Rosado could stand or walk for four to six hours in an eight hour day and sit for six to eight hours in an eight-hour work day.  (See page 8 above.)  Dr. Rodriguez-Betancourt even opined that Rosado could "perform a clerical type job" provided he had the "physical freedom to sit [and] stand and change position [without] heavy lifting."  (See page 8 above.)

The opinions of Drs. Lin and Rodriguez-Betancourt are consistent with Rosado's own testimony at the second hearing that  he could "stand four to six hours during the course of a day, and two hours without interruption" (see page 5 above), and  the opinions of Dr. Kao, the consultative physician who concluded that Rosado should avoid frequent bending, but was otherwise "stable" (see page 7 above), and the state agency physicians who found that Rosado could lift and carry twenty pounds occasionally and ten pounds frequently, and could stand  or walk for a total of six hours during an eight-hour  work day.  (See page 7 above.)

The opinion of Rosado's treating psychiatrist, Dr. Lucas, supports ALJ Katz's determination that Rosado could perform "tasks which require minimal stress and minimal interactions with the public."  (See page 10 above.)  Although Dr. Lucas' assessed that Rosado's "anger/rage can be explosive and inappropriate to function in a[n] employment setting" (R. 177), she also opined that Rosado was a "highly intelligent individual" who could succeed in a "comfortable,

familiar surroundings where he does not experience external pressure or control" and would not require any "special supervision" provided he continued psychotherapy.  (R. 177-78.)  Overall, Dr. Lucas felt the prognosis was good for Rosado to be "reintegrated in[to] the work force . . . ."  (See page 8 above.)

        Based on the ALJ's assessment of Rosado's functional ability, the vocational expert testified that there were a wide range of jobs readily available in the local and national economy that Rosado could perform, including a garment sorter, marker, duplicating machine operator, library page, or nighttime data entry clerk.  (See page 5 above.)[20/]  With respect to the nighttime data-entry job, Rosado agree that he could perform such work if it were offered to him.  (See page 5 above.)

        Reference to the Grid also demonstrates that a person of Rosado's age (forty-five years old) (R. 86, 104), education (high school equivalency) (R. 23-24, 104), transferable skills

---

[20/]    A vocational expert can provide evidence regarding the existence of jobs in the economy and a particular claimant's functional ability to perform any of those jobs.  20 C.F.R. §§ 404.1566(e), 416.966(e); see, e.g., Calabrese v. Astrue, 358 Fed. Appx. 274, 275-76 (2d Cir. 2009); Butts v. Barnhart, 416 F.3d 101, 103-04 (2d Cir. 2005); Taylor v. Barnhart, 83 Fed. Appx. 347, 350 (2d Cir. 2003); Jordan v. Barnhart, 29 Fed. Appx. 790, 794 (2d Cir. 2002); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988); Dumas v. Schweiker, 712 F. 2d 1545, 1553-54 (2d Cir. 1983); Quezada v. Barnhart, 2007 WL 1723615 at *13 n.20; Snipe v. Barnhart, 05 Civ. 10472, 2006 WL 2390277 at *18 (S.D.N.Y. Aug. 21, 2006) (Peck, M.J.), report & rec. adopted, 2006 WL 2621093 (S.D.N.Y. Sep. 12, 2006); de Roman v. Barnhart, 03 Civ. 0075, 2003 WL 21511160 at *17 (S.D.N.Y. July 2, 2003) (Peck, M.J.); Bosmond v. Apfel, 97 Civ. 4109, 1998 WL 851508 at *8 (S.D.N.Y. Dec. 8, 1998); Fuller v. Shalala, 898 F. Supp. 212, 218 (S.D.N.Y. 1995) (The "vocational expert, . . . provided several examples of unskilled . . . jobs that are available in the national and local economies for a person with [plaintiff's] condition, age, education, and work experience. . . . Accordingly, the Secretary satisfied her burden of showing that such jobs exist in the national economy.").

(keyboarding and computer data entry and retrieval) (R. 23-24, 48), and ability to perform light

exertional work (R. 23-34), is not disabled for purposes of Social Security benefits.  See 20 C.F.R.

404, Subpt. P, App. 2, §§ 201.21-22, 202.21-22.

   The ALJ's decision that Rosado was not disabled for purposes of Social Security

benefits is supported by substantial evidence.    .

## CONCLUSION

   For the reasons set forth above, the Commissioner's determination that Rosado was

not disabled within the meaning of the Social Security Act during the period April 16, 1997 through

January 29, 1999, is supported by substantial evidence.  Accordingly, the Commissioner's motion

for judgment on the pleadings (Dkt. No. 11) is GRANTED.

   SO ORDERED

Dated:  New York, New York
    May 20, 2010

                  **Andrew J. Peck**
                  United States Magistrate Judge

Copies to:  Eli E. Rosado (Regular & Certified Mail)
     A.U.S.A. James P. Peck, Esq.

H:\OPIN\ROSADO